## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## FLORENCE DIVISION

| | | |
|---|---|---|
| James Doe and Jane Doe, Individually, and in a representative capacity as the parents and next friends of their minor son, John Doe (J.D.) | ) ) ) ) | |
| Plaintiffs, | ) ) ) | **COMPLAINT** |
| vs. | ) ) | **(Jury Trial Demanded)** |
| Florence Baptist Temple, Florence Christian School, Michael Baron Smith, III, coach at Florence Christian School and S.P., an anonymous minor under the age of Eighteen (18), | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

TO: DEFENDANTS AND THEIR COUNSEL

Plaintiffs James Doe and Jane Doe, Individually, and in a representative capacity as the parents and next friends of their minor son, John Doe, complaining of Defendants, respectfully show unto the Court and allege as follows:

### PARTIES

1.    James Doe and Jane Doe (collectively, "Does") are citizens and residents of Florence County, South Carolina.

2.     The adult Does are the parents, natural guardians, and next friend of their minor son, John Doe (pseudonym, not actual identity, hereinafter, "J.D.") and are bringing this case individually and in a representative capacity for J.D.

3.    Plaintiffs are filing this Complaint anonymously under the pseudonym James Doe (father), Jane Doe (mother), and John Doe (son).

1

4.    The Does minor son is identified in this action as J.D., as required by South Carolina Court Rules.

5.    The subject matter of the lawsuit could bring embarrassment and publicity to the Plaintiffs and/or their family.

6.    Plaintiffs, especially the minor child, J.D., are vulnerable to the mental or physical harm of disclosure.

7.    Plaintiffs risk humiliation and embarrassment due to the publication of the material and proceeding with a pseudonym brings some comfort.

8.    If the ability to proceed with a pseudonym is not allowed, Plaintiff J.D. will experience further harm because of exercising his legal rights.

9.    If Plaintiffs are forced to disclose their identity, that disclosure will amplify the injury that is at issue in this litigation.

10.    The public interest in the disclosure of Plaintiff's identity is minimal.

11.    There will be no furtherance of justice by requiring the public disclosure of Plaintiffs' identity.

12.    Once the Defendants are served and retain counsel, Plaintiffs identities will be revealed to Defendants in a confidential manner, if not already known.

13.    Defendants are not prejudiced by allowing Plaintiffs to proceed anonymously, and any potential prejudice will be mitigated by the confidential disclosure of his actual identity.

14.    The Defendants knew or should know of the Plaintiff's identities because all Defendants were aware of the  exploitation and/or physical abuse by S.P. of the minor Plaintiff, J.D.

15.    The Defendant Florence Baptist Temple ("FBT") is a large Southern Baptist Convention affiliated church located in Florence County, South Carolina.

16.    The Defendant Florence Christian School ("FCS") is a church affiliated educational institution located in Florence County, South Carolina.

17.    FCS is owned, supported, controlled and  affiliated with Florence Baptist Temple.

18.    FCS and FBT will be jointly referred to herein as FCS/FBT

19.    Plaintiff J.D. was a student at FCS and Plaintiffs Does attended FBT on a few occasions.

20.    Defendant, Michael Smith ("Smith"), is a coach and teacher at FCS and is, upon information and belief,  a citizen and resident of Florence County, South Carolina.

21.    Defendant S.P.  ("S.P.") is a person under the age of eighteen (18) and is a student at FCS.

22.    Defendant FCS has the right or power to direct and control the way its employees and/or agents provide safe environments for minors to participate in school activities and be safe in church school  and be free from harassment and physical abuse from coaches/teachers or fellow students.

23.    Each act of any named Defendant or identified actions of employees and/or agents of any Defendants identified in this action were performed within the course and scope of any duty, employment, or agency capacity.

24.    Each act of negligence, gross negligence, recklessness, and/or willful and wanton conduct by any person employed by or a volunteer of FCS is an act or occurrence under the South Carolina Tort Claims Act.

25.    Defendants' negligent, grossly negligent, reckless, willful, or wanton acts, omissions, and liability includes that of their agents, principals, employees, and/or servants, both directly and vicariously, pursuant to principals of non-delegable duty, corporate liability, apparent authority, agency, ostensible agency, and/or respondeat superior.

## JURISDICTION AND VENUE

26.    The United States District Court of the State of South Carolina has jurisdiction for this case pursuant to  28 U.S.C. section  1331.

27.    The events giving rise to causes of actions in this case occurred in Florence County.

28.    This proper Division for this case is the Florence Division of the United Sates District Court for the State of South Carolina.

## JOINT AND SEVERAL LIABILITY

29.    The above-named Defendants are jointly and severally liable for all damages alleged herein since their negligent, grossly negligent, reckless, and wanton acts and omissions, singularly, or in combination, are the contributing proximate causes of Plaintiffs' injuries damages and losses.

## DAMAGES ALLEGATIONS AS TO DEFENDANTS

30.    Defendant FCS/FBT will likely claim to be charitable entities which would subject them to charitable immunity caps.

31.    The Charitable Immunity Act ("CIA") references the South Carolina Tort Claims Act as the predicate statutory authority for the number of caps to be imposed by any person or entity against a CIA entity.

32.    In relevant part, regarding limitations of liability under the South Carolina Tort Claims Act, S.C. Code Ann. Section 15-78-120, provides as follows:

(a)    For any action or claim for damages brought under the provisions of this chapter, the liability shall not exceed the following limits:

    (1)    Except as provided in Section 15-78-120(a)(3), no person shall recover in any action or claim brought hereunder a sum exceeding three hundred thousand dollars because of loss arising from a single occurrence regardless of the number of agencies or political subdivisions involved.

    (2)    Except as provided in Section 15-78-120(a)(4), the total sum recovered hereunder arising out of a single occurrence shall not exceed six hundred thousand dollars regardless of the number of agencies or political subdivisions or claims or actions involved.

33.    Under S.C. Code Ann. Section 15-78-30: "Occurrence" is defined as "an unfolding sequence of events which proximately flow from a single act of negligence."

34.    Each act of negligence, gross negligence, recklessness, and/or willful and wanton conduct by any person employed by or an agent of FCS/FBT is an act or occurrence regarding the South Carolina Tort Claims Act/CIA.

35.    There are multiple breaches of duties of care and industry standards in this case, and, upon information and belief, each breach (or occurrence) can be stacked to create multiple "caps" for any Defendant under the CIA/TCA (depending on what a jury ultimately decides).

36.    All Defendants have been alleged to have committed grossly negligent or reckless acts and Defendant Smith  is  named individually.

37.    If there is a finding by a jury of gross negligence or recklessness against Smith, he is  individually subject to liability and subject to unlimited exposure for damages.

38.    Plaintiff is further alleging that Defendants, and their agents and/or employees committed grossly negligent and/or reckless acts which breached the duties of care and industry standards for which caps do not exist under the CIA/TCA.

39.     Plaintiff has identified multiple breaches of duties by Defendants and their agents and/or employees which are known and there are other breaches not addressed which are unknown at this time.

**ECCLESIASTICAL ACTIONS ARE DIFFERENT THAN SECULAR ACTIONS**

40.     The actions by employees or agents of religiously affiliated schools can be both ecclesiastical and secular in nature.

41.     Preaching a sermon to students  is ecclesiastical in nature.

42.     An ecclesiastical polity is the operational and governance structure of a church, church-school  or of a Christian denomination.

43.     Church organizations often refer to problems or troubles as ecclesiastical in nature when the problem or trouble is secular in nature.

44.     There is a difference between ecclesiastical (relating to church or church-school doctrine and religious indoctrination) and non-ecclesiastical or secular natters.

45.     For example, financial policy can be ecclesiastical in nature (tithing) and non-secular (the amount of money to be spent on a gymnasium).

46.     The actions and behavior of the church entity or organization and their agents and/or employees  must be examined to determine if issues or circumstances are ecclesiastical or secular in nature.

**IT IS UNQUESTIONABLE THAT ANY MATTER INVOLVING THE PHYSICAL ABUSE AND FAILURE TO ACT BY SMITH IS NON-SECULAR IN NATURE.**

47.     Though church organizations (including church affiliated schools)  are founded on ecclesiastical principles, they must utilize non-ecclesiastical principles (secular) at times in governance, hiring, firing, monitoring, supervision, disciplining employees, creation of policies and procedures, and creation of safety programs for students.

48.     These secular actions are necessary because  reasonable hiring, firing, monitoring, supervision, oversight  and disciplinary actions requires a church organization (as well as any secular organization) to protect students from harm.

49.     The secular actions of FCS/FBT, their agents and/or employees had to be performed in a reasonable manner to protect students from harm.

50.     The management of the protection of students or safety of minor students by FCS/FBT  is rooted in non-secular actions.

51.     Management of child safety policies and procedures and programs by FCS/FBT regarding coaches/teachers, misconduct by members of church affiliated school staff , and responses to physical abuse of a student  and failure to monitor, supervise and act with regard to safety of a student being choked out  is non-ecclesiastical in nature.

52.     Supervision and monitoring of students in a classroom who are engaged in physical activity where harassment or physical abuse could occur is not ecclesiastical in nature.

53.     The supervision of Coaches. Teachers and students are not ecclesiastical in nature.

54.     The creation of  policies and/or procedures concerning the prevention of or mitigating the physical abuse of a student by another is not ecclesiastical in nature.

55.     The actions by FCS/FBT in administering policy, procedure, and control over teachers/coaches in matters of supervising and monitoring students to prevent harassment and physical abuse of a minor is not ecclesiastical in nature.

56.     In this case, FCS/FBT and Smith were complicit in S.P.'s physical abuse of the Plaintiff J.D.

57.     The monitoring, supervision, investigation, disciplining, and decisions made regarding allegations of harassment or physical abuse of J.D. at FCS is secular in nature.

58.    Harassment and physical abuse of a student is not ecclesiastical in nature.

59.    It should be apparent that abridgement of any personal boundaries between students, witnessed by a teacher or coach and  knowledge of such violation of boundaries by a teacher/coach and the failure to notify appropriate authorities or the parents of such minor is secular in nature.

60.    Defendants have a non-delegable non-ecclesiastic duty to provide teachers/coaches with adequate knowledge, training, and supervision to prevent  harassment and/or physical  abuse of a minor child at FCS/FBT.

61.    This knowledge, training, and supervision of a teacher/coach at FCS to prevent harassment and/or  physical abuse of a student on another student (in this case, a minor) is not ecclesiastical in nature.

62.    The imbalance of power between adults and a minor student at FCS is secular in nature.

63.    This imbalance of power is recognized by secular corporate organizations.

64.    As a result of this imbalance of power dynamic, the church and corporate organizations share a need and desire to protect the potential victims of harassment or physical abuse.

65.    When this imbalance of power is manipulated and misused, it can lead to non-ecclesiastical boundary crossing by students on other students which results in harassment or physical abuse (which occurred in this case).

66.    It is never permissible or acceptable for a church school affiliated teacher/coach to allow a minor child to be harassed or physically abused.

67.    Defendant FCS/FBT and Smith  do not get a pass by simply claiming a church affiliated schoolteacher was monitoring students engaged in physical activity  and then claiming ecclesiastical privilege.

68.    The Defendants are not allowed to sweep incidents under the rug and act like it did not happen.

69.    For decades, the church has hidden behind the cloak of ecclesiastical privilege.

70.    This privilege is an abused form of leniency and immunity propagated by the church or church schools  to shirk their responsibility for the misconduct of their pastors, employees, teachers/coaches, and volunteers onto the lay victim.

71.    The need to protect the dignity and reputation of those who come forward is not ecclesiastical in nature.

72.    It is a form of human decency and openness to promote transparency.

73.    It is what any good corporate secular citizen would do under the same circumstances.

74.    Before the underlying events in this case took place, employees and/or agents of Defendants knew, or reasonably should have known, its vulnerable population of minor students would likely be subject to harassment or physical abuse if reasonable policies and procedures were not created, and proper steps implemented in the hiring, supervision, training, and employment of teachers/coaches.

75.    Creation of policies and procedures to prevent  harassment and physical abuse is non-ecclesiastical in nature.

76.     FCS/FBT and Smith  knew or should know that minor students are subject to physical abuse, manipulation, and exploitation if their teachers/coaches do not properly supervise and monitor interactions between students.

77.     At all times relevant hereto, all employees and/or agents of Defendants FCS/FBT (with respect to the facts alleged herein) acted within the scope of their employment and/or agency while interacting with Plaintiff J.D. and/or being aware of interactions between Defendant S.P. and minor Plaintiff J.D.

78.     FCS/FBT facilitated an improper  non-ecclesiastical environment of harassment, and physical abuse at their church school which resulted in injuries and harm to Plaintiff J.D.

## TEACHER  AND STUDENT IMBALANCE OF POWER PROMOTES AND FACILITATES HARASSMENT AND PHYSICAL ABUSE OF STUDENTS

79.     Teachers  wield enormous influence over their students' lives, meaning many students choose not to report teacher misconduct because they do not want to jeopardize future opportunities.

80.     As students across the country come forward to share their stories about teacher misconduct, the relationship between faculty and students has emerged as one of the ripest for misconduct or abuse, with teachers/coaches quietly wielding major influence over the trajectory of their students' lives.

81.     Teachers/coaches possess the power to intimidate and mistreat students.

82.     The teacher/coach  is the person who issues grades or allows playing time  to students.

83.     Teacher/Coaches wield influence in a student's progress in chosen fields or interests.

84.    In many cases, students depend on teachers/coaches for not only grades but mentorship, recommendations, and interest  opportunities.

85.    Students pursue a course of study where the goal is to learn from teachers/coaches, and that didactic relationship exposes them to risk when the teacher/coach sees the relationship as an opportunity to promote their own goals.

86.    By virtue of their roles, teachers/coaches engage in a range of behaviors that exercise power over students, including evaluation as a coach, and provision of recommendations for future educational or sports related opportunities.

87.    Teachers/Coaches are cognizant of the power differential of each of these circumstances, and they are supposed to refrain from misuse of their power.

88.    Whenever possible, teachers and coaches  should take steps to eliminate any unnecessary negative effects of the power differential.

89.    Given the multiple roles that teachers and coaches  play (e.g., instructor, academic advisor, coach), multiple and overlapping relationships with students are common.

90.    A teacher-coach/student relationship calls for vigilance on the part of the faculty member because such relationship presents an increased potential for inappropriate and exploitative outcomes, particularly considering the power imbalances that exist.

91.    When a teacher/coach finds that their relationship with a student poses potential for concern, they are expected to take steps to remediate the situation through means other than engage in misconduct regarding the student.

92.    The psychological power conferred by the status differential between teacher/coach and student is immense.

93.    There is no situation where it is appropriate for a teacher/coach to allow a student to be exploited, harassed, or physically abused.

## CHARITABLE INSTITUTIONS OF HIGHER LEARNING (CHURCH SCHOLL) IS SUBJECT TOT TITLE IX RULES AND REGULATIONS

94.    FCS is owned, operated, financially supported and affiliated with FBT.

95.    FBT is a member of the Southern Baptist convention and identifies as being a denomination of Southern Baptist.

96.    The sponsorship of FTC by FBT renders the school a charitable entity, also known as a 501 (C) (3) organization.

97.    Title IX is a federal civil rights law in the United States that was passed as part of the Education Amendments of 1972.

98.    This law states that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

99.    Schools that receive  federal funding must adhere to Title IX for the protection of students.

100.    Since Title IX is a federal law, schools are legally required to comply with its provisions.

101.    Title IX ensures that no person is discriminated against based on their sex in educational programs or activities.

102.    This is crucial for creating an environment where all students have equal access to educational opportunities and resources.

103.    Title IX also addresses issues such as sexual harassment, assault, and violence in educational settings.

104.    Compliance with Title IX helps schools to create a safe and supportive environment for all students, which is essential for effective learning and personal development.

105.    Adherence to Title IX is necessary for legal compliance, ensuring equal opportunities, maintaining a safe learning environment, promoting gender equity, and securing federal funding.

106.    It is a fundamental aspect of creating an inclusive and equitable educational system.

107.    FCS/FBT will likely argue that they are a religiously affiliated private school that is exempt from federal income taxes under 26 USC § 501(c)(3) and not subject to Title IX jurisdiction as they were not a direct recipient of federal financial assistance during the relevant time periods.

108.    However, FCS/FBT's tax-exempt status under 26 U.S.C. § 501(c)(3) represents federal financial assistance sufficient to subject the school to the requirements of Title IX.

109.    In Buettner-Hartsoe v. Balt. Lutheran High Sch. Ass'n, Case 1:20-cv-03214-RDB (D. Md. July 21, 2022), Judge Bennett stated,

> "The tax-exempt status of a private school subjects it to the same requirements of Title IX imposed on any educational institution. CPS cannot avail itself of federal tax exemption but not adhere to the mandates of Title IX." Citing the Supreme Court's decision in Regan v. Taxation with Representation, Bennett extended the Court's analysis in that case to Title IX, quoting that "[b]oth tax exemptions and tax-deductibility are a form of subsidy that is administered through the tax system. A tax exemption has much the same effect as a cash grant to the organization of the amount of tax it would have to pay on its income . . ."

110.    Title IX is a landmark civil rights law that seeks to eradicate gender discrimination and harm to students  "by ending federal subsidies of such discrimination." S. REP. NO. 100-64, at *7 (June 5, 1987), as reprinted in 1988 U.S.C.C.A.N. at *9.

111.    § 501(c)(3) tax benefits are "Federal financial assistance" under Title IX and subjects private church affiliated schools to the rules and regulations of Title IX.

## GENERAL FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

112.    J.D. was in the eighth (8th)  grade at Florence Christian School when he was assaulted by S.P..

113.    He was a straight A student and an athlete who played on the  football and baseball teams.

114.    At FCS, students do not have many options for electives, so J.D.  chose weight room as his only elective for the eighth-grade fall semester and he attended weight room Monday-Thursday each week.

115.    His weight room and physical education ("PE") teacher was Coach Michael (Mike) Smith.

116.    For some reason, unbeknownst to Plaintiffs, Coach Smith disproportionately punished J.D.

117.     When asked him about this, Coach Smith states that J.D. is disrespectful to him by asking him why he is being punished when no one else is receiving like punishment for similar actions.

118.    J.D. is  often made to do excessive exercises such as bear crawls and sandpits by Coach Smith.

119.    A bear crawl requires crawling the length of the football field on hands and toes with knees bent.

120.     Sandpits require the students to crawl forty (40) yards using only their elbows through a pit of sand, gravel, and a lot of times, fire ants. It is grueling.

121.    On October 18, 2023, J.D. was told by Coach Smith that he would have to do an hour of continuous movement in sand pits to make up for not finishing his punishment from the day before.

122.    Despite being singled out and before his punishment for that day began, J.D. was in the school's weight room working out.

123.    On that day he achieved a new goal— he bench pressed 100 lbs.

124.    J.D. was excited and was celebrating with his friends.

125.    At this time, S.P. aggressively approached J.D. saying, "you shut the fuck up when I'm talking to you" and began to choke J.D.

126.    S.P. was bigger and two years older than J.D.

127.    S.P. had J.D.'s neck in the antecubital (front of elbow) bend of this arm.

128.    S.P.'s muscles were flexed so tightly that J.D. could not breathe, and he could not speak.

129.    J.D. tried to let S.P. know he was being choked out by hitting his hand against S.P.'s trunk and legs to let him know that he was in trouble

130.    S.P.  would not stop choking him.

131.    J.D. reports hearing peoples voices fade as he loses his vision.

132.    Then, J.D.'s body went limp as he lost consciousness and S.P. dropped him and caused J.D.'s head to hit the wall and then the floor.

133.    J.D.'s friends report he was unconscious for approximately thirty (30) seconds.

134.    While S.P. was choking out J.D., Coach Smith was sitting beside them.

135.    Coach Smith was  wrapping another student's ankle, sitting 3ft away from where S.P. was choking out J.D.

136.    Coach Smith is a teacher and Coach with authority over students and  did not intervene.

137.    J.D. recalls looking at Coach Smith as he was choked out.

138.    When J.D. woke up, he immediately began to cry.

139.    J.D. sat up, looked at Coach Smith, and Coach Smith  didn't acknowledge him.

140.    An older student, P.W., assisted J.D. and assisted him  to the locker room where J.D. sat down.

141.    Once J.D.  was able to walk, he approached Coach Smith and asked if he had seen what happened.

142.    Coach Smith told J.D. to sit down and told him that they would talk later.

143.    Coach Chris Coker entered the locker room to get the boys ready for practice.

144.    Other students told Coach Coker that Coach Smith saw what happened and did nothing and was not going to do anything.

145.    Coach Coker asked what happened, and the students told him what happened to J.D.

146.    The interaction with Coach Coker was approximately  5-6 minutes after the choking incident occurred.

147.    At this time, Coach Coker began to talk to the students about what happened.

148.    J.D. sat in the locker room from 2:45 until Coach Garrett approached him around 3:20.

149.    Having spoken to J.D., Coach Garrett called Jane Doe to tell her about the incident.

150.    The next day, October 19, 2023, Jane Doe, and her father  went to FCS/FBT and spoke to the principal of FCS, Mr. Jim Berry.

151.    They wanted to know how the choking incident would be handled and how Coach Smith's refusal to intervene would be handled.

152.    Mr. Berry informed Jane Doe and her father that S.P. would be allowed to return to school the next day as he only received one day suspension as his punishment.

153.    Since October 19, 2023, J.D. has missed a lot of school as he didn't feel comfortable attending school with a coach/teacher singling him out, a student who could choke him again with little punishment and administration trying to sweep it under the rug.

154.    No one at FCS ever sought medical attention for J.D. after he was choked out and struck his head.

155.    Jane Doe confronted Coach Smith and asked him why he would not help the child.

156.    He reported to Jane Doe that he had his back to J.D. when it happened and that he had helped by sending a kid to help J.D.

157.    Upon information and belief, that was a false statement made to appease a concerned parent.

158.    FCS and FBT were negligent, grossly negligent, and reckless in their actions towards Plaintiffs in failing to have proper policies and procedures in place, failing to monitor and supervise teachers/coaches and failing to protect students from foreseeable harm.

159.    Coach Smith was negligent, grossly negligent, and reckless in his actions towards Plaintiffs in picking on J.D., failing to intervene while an older, bigger student was assaulting J.D., and being an adult Bully.

160.    S.P. assaulted J.D.

161.    The actions of all Defendants have caused injuries and harm to Plaintiffs.

**FOR A FIRST CAUSE OF ACTION AS TO DEFENDANTS**
(Negligent Hiring, Supervision, Monitoring and Retention)

162.     Plaintiff reiterates and realleges the above Paragraphs as though set forth herein verbatim and further alleges:

163.     Defendant Mike Smith was hired by Defendant FCS/FBT prior to the harassment and physical assault of J.D.

164.     Defendant FCS/FBT had a duty to properly vet and investigate Mike Smith before hiring him as a coach and teacher.

165.     Defendant FCS/FBT  voluntarily accepted the duty and responsibility of supervising and monitoring Mike Smith in allowing him to serve as a teacher at FCS/FBT.

166.     Defendant Mike Smith voluntarily undertook the duty of supervising and monitoring students at FCS/FBT to protect students from harm.

167.     Reasonable monitoring and supervision by FCS/FBT and Mike Smith would have prevented the injury to J.D.

168.     Despite having knowledge of Coach Smith's inequitable treatment of J.D., FCS/FBT allowed Smith to continue coaching and interacting with J.D.

169.     The inappropriate behavior and assault by S.P. facilitated by the actions and/or inactions of Defendants FCS/FBT and Mike Smith.

170.     FCS/FBT retained Mike Smith after this incident.

171.     But for the actions and inactions of FCS/FBT and Mike Smith, J.D. would not have been choked out by S.P.

172.     As a direct and proximate result of Defendant FCS/FBT's negligent, grossly negligent and reckless  hiring, supervision, monitoring, and retention of Smith, Does and J.D. have suffered and continue to suffer damages and Plaintiffs are entitled to judgment against Defendants

for actual damages (against all parties), and punitive damages (except as to FCS/FBT), all to be determined by a jury at the trial of this action.

173.    As a direct and proximate result of Defendant Mike Smith's negligent, grossly negligent and reckless supervision, monitoring, of students, including S.P., Does and J.D. have suffered and continue to suffer damages and Plaintiffs are entitled to judgment against Defendants for actual damages (against all parties), and punitive damages (except as to FCS/FBT), all to be determined by a jury at the trial of this action.

**FOR A SECOND CAUSE OF ACTION AS TO ALL DEFENDANTS**
(Negligence/Recklessness/Willful and Wanton Conduct)

174.    Plaintiff reiterates and realleges the above Paragraphs as though set forth herein verbatim and further alleges:

**AS TO FCS/FBT AND MICHAEL SMITH**

175.    As alleged above, Plaintiff J.D. was exploited, harassed, and physically abused by S.P.

176.    Defendants FCS/FBT and Mike Smith had multiple duties to J.D., including, but not limited to,  to provide a culture of safety and an environment free from assault at his school.

177.    Defendants FCS/FBT and Coach Smith duties arose from J.D. being present at the FCS/FBT school.

178.    Defendants FCS/FBT and Coach Smith breached multiple duties owed to Plaintiff in a negligent, grossly negligent, and  reckless manner in committing one or more of the following acts of omission or commission, any, or all of which were breaches of the duties owed to Plaintiffs:

   a.    As an unfolding sequence of events proximately flowing from failing to ensure Plaintiff was not exposed to injurious behavior by Defendant S.P. as a first occurrence;

b.      As a separate and independent unfolding sequence of events proximately flowing from failing to ensure Plaintiff was not exposed to injurious behavior by Defendant Mike Smith  as a second  occurrence;

c.      As a separate and independent unfolding sequence of events flowing from failing to protect Plaintiff from Defendant S.P. as a third occurrence;

d.      As a separate and independent unfolding sequence of events flowing from failing to ensure Plaintiff was safe while in Defendant Smith's presence as a fourth occurrence;

e.      As a separate and independent unfolding sequence of events flowing from Defendants failure to properly punish S.P. thus ensuring constant exposure to J.D. as a fifth occurrence.

f.      As a separate and independent unfolding sequence of events flowing from failing to properly investigate the choking incident and take appropriate actions against Defendant Smith and Defendant S.P. as a sixth occurrence.

g.      As a separate and independent unfolding sequence of events flowing from failing to properly institute policies, procedures, or protocols regarding coaches or teachers allowing a student to harass, exploit and physically abuse a minor child as a seventh occurrence.

h.      As a separate and independent unfolding sequence of events flowing from failing to investigate Mike Smith's actions when it first became known that he allowed a student to physically abuse another student as an eight occurrence; and,

i.      In such other particulars as will be discovered through discovery undertaken pursuant to the S.C. Rules of Civil Procedure.

179.    As a direct and proximate result of Defendants' negligence, gross negligence, and recklessness, Does and J.D. have suffered and continue to suffer damages and Plaintiffs are entitled to judgment against Defendants for actual damages (against all parties), and punitive damages (except as to FCS/FBT), all to be determined by a jury at the trial of this action.

**FOR A THIRD CAUSE OF ACTION AS TO ALL DEFENDANTS**
(Outrage/Intentional or Reckless Infliction of Emotional Distress)

180.    Plaintiff reiterates and realleges the above Paragraphs as though set forth herein verbatim and further alleges:

181.   Defendants recklessly inflicted severe emotional distress on Plaintiff J.D. by virtue of their actions and it was certain or substantially certain that such distress would result from Defendants' conduct.

182.   Defendants' conduct was extreme and outrageous as to exceed all possible bounds of decency and is intolerable in a civilized community.

183.   Defendants' actions caused Plaintiff J.D. emotional distress.

184.   The emotional distress suffered by Plaintiff J.D. was so severe that no reasonable person could be expected to endure it and the distress it caused, includes, but is not limited to, medical problems, emotional issues, mental anguish, and behaviors that are capable of objective diagnosis.

185.   As a direct and proximate result of the intentional and/or reckless infliction of emotional distress on Plaintiffs by Defendants, Does and their minor son, J.D., have suffered and continue to suffer damages and Plaintiffs are entitled to judgment against Defendants for actual damages (against all parties), and punitive damages (except as to FCS/FBT), all to be determined by a jury at the trial of this action.

**FOR A FOURTH CAUSE OF ACTION AS TO ALL DEFENDANTS**
**(Title IX, 20 U.S.C. § 1681, et seq.)**

186.   Plaintiff reiterates and realleges the above Paragraphs as though set forth herein verbatim and further alleges:

187.   Title IX of the Education Amendments of 1972 requires that "No person… shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…."

188.   FCS/FBT are subject to Title IX by virtue of receiving tax benefits through its designation as a 501 (C) (3) corporation.

189.    FCS/FBT knew it had to protect students from physical harm

190.    Physical harm and discrimination were directed at J.D. was because he was a male in gender.

191.    Coach Smith allowed a student to physically assault and hurt Plaintiff J.D.

192.    If J.D. had been a female, then Coach Smith would have intervened.

193.    The family of J. D made a complaint to FCS/FBT regarding what happened in this matter.

194.    That complaint should have triggered an immediate investigation and hearing by FCS/FBT.

195.    FCS/FBT did nothing after this physical assault except suspend S.P. for one day.

196.    They did nothing to Coach Mike Smith.

197.    FCS/FBT did not abide by mandated Title IX investigations, hearings, or actions.

198.    Plaintiff has been subjected to discrimination by Coach Mike Smith in his role as a teacher/coach at FCS/FBT based on his gender.

199.    FCS/FBT USC failed to take appropriate corrective action, thereby acting with deliberate indifference to Plaintiff's rights and safety in one or more of the following ways: (a) failing to investigate S.P.'s harassment and abuse of J.D. and report to the proper authorities sexual abuse to appropriate authorities; (b) failing to cure or even attempt to cure obvious and known discrimination by Mike Smith against J.D.; (C) In Smith failing to report S.P. for his assault and harassment of J.D.; and, (D) in facilitating continuous exposure of J.D. to Smith or S.P. after the choking incident

200.    The deliberate indifference, actions, and/or omissions described above caused Plaintiff to suffer  harassment, physical abuse, and continued harm by FCS/FBT failing to investigate the actions of S.P. and Smith from October 18, 2023 to present.

201.    Title IX requires FCS/FBT to provide educational opportunity on an equal basis to all students regardless of their gender.

202.    FCS/FBT failed to comply with Title IX despite actual knowledge of Teacher/student discrimination or student on student abuse, and FCS/FBT continued to allow Smith and S.P.  access to J.D. .

203.    Failing to remedy Plaintiff's continued harassment or discrimination after the assault was a Title IX violation EACH time it occurred.

204.    FCS/FBT  failed to comply with Title IX in that it failed to ensure that the education provided to J.D. as a male student would be on an equal basis compared to the education provided by FCS/FBT to female students.

205.    20 U.S.C. § 1981 affords Plaintiff a civil cause of action for damages.

206.    42 U.S.C. § 1988 identifies damages, court costs, litigation expenses and attorney's fees as within the remedies available in an action brought pursuant to 20 USC § 1981.

207.    As a direct and proximate result of the breach of Title IX by Defendants FCS/FBT and Smith, Does and their minor son, J.D., have suffered and continue to suffer damages and Plaintiffs are entitled to judgment against Defendants for actual damages (against all parties), and punitive damages (except as to FCS/FBT), all to be determined by a jury at the trial of this action.

### FOR A FIFTH CAUSE OF ACTION AS TO ALL DEFENDANTS
(Assault and Battery)

208.    Plaintiff reiterates and realleges the above Paragraphs as though set forth herein verbatim and further alleges

209.    S.P. threatened and intended to harm the Plaintiff (assault).

210.    S.P. inappropriately touched and choked out the minor child J.D. (battery).

211.    As a direct and proximate result of Defendant S.P.'s actions outlined above, Plaintiff J.D. suffered injuries and damages.

212.    Plaintiff J.D. will likely have to undergo medical treatment, including therapy, for the remainder of his life.

213.    Plaintiff J.D. will likely suffer life care expenses, loss of income/earning capacity and loss of enjoyment of life due to the actions of the Defendant S.P.

214.    As a direct and proximate result of Defendant S.P.'s assault and battery of J.D., Does and J.D. have suffered and continue to suffer damages and Plaintiffs are entitled to judgment against Defendants for actual damages (against all parties), and punitive damages (except as to FCS/FBT), all to be determined by a jury at the trial of this action.

### FOR A SIXTH CAUSE OF ACTION
(Violation of Restatement of Torts 323)

215.    Plaintiff reiterates and realleges the above Paragraphs as though set forth herein verbatim and further alleges:

216.    Defendants undertook, for consideration, the provision of providing safe places for Plaintiff to practice his education pursuant to the Restatement (Second) Torts §§ 323.

217.    The Restatement's negligent undertaking provisions impose a duty of care only when a defendant renders services that it "should recognize as necessary for the protection" of another. Restatement (Second) Torts §§ 323.

218.    Plaintiff suffered severe and permanent harm as described above because of Defendants' failure to, among other things, exercise reasonable care in providing safety for a minor

student or in artificially creating an environment of danger and voluntarily undertaking the duty to hire, monitor, supervise and retain Smith and supervise S.P.

219.    As a direct and proximate result of Defendants' violation of restatement of torts 323, Does and J.D. have suffered and continue to suffer damages and Plaintiffs are entitled to judgment against Defendants for actual damages (against all parties), and punitive damages (except as to FCS/FBT), all to be determined by a jury at the trial of this action.

## FOR A SEVENTH CAUSE OF ACTION
### (Necessaries Claim)

220.    Plaintiff reiterates and realleges the above Paragraphs as though set forth herein verbatim and further alleges:

221.    Plaintiff Does are responsible for their Minor Child J.D.'s  medical bills, medical care, and overall care until he turns eighteen (18).

222.    James Doe and Jane Doe will suffer economic damages, including but not limited to, the provision of medical care, life care expense, psychiatric expenses, lost wages, counseling services, and special programs due to the actions and/or inactions of Defendants as noted in all paragraphs above.

223.    As a direct and proximate result of the multiple acts and/or omissions as herein alleged on the part of Defendants in all paragraphs above, the Minor Child J.D. has suffered the following damages, including, but not limited to:

      a.     Substantial medical expenses that are reasonably certain to occur for the remainder of his life;

      b.     Substantial life care expenses that are reasonably certain to occur for the remainder of his life;

      c.     Substantial loss of earnings and impairment of earning capacity that are reasonably certain to occur for the remainder of his life;

     d.     Disability that is likely to occur for the remainder of his life, including the necessity of psychiatric care;

     e.     Substantial injury to his psyche and emotional state; and,

     f.     Substantial loss of enjoyment of life.

224.    As a direct and proximate result of the multiple acts and/or omissions as herein alleged on the part of Defendants in all paragraphs above, James Doe and Jane Doe have suffered the following damages, including, but not limited to:

     a.     Substantial medical expenses for the minor child that are reasonably certain to occur before he reaches the age of eighteen (18);

     b.     Substantial life care expenses for the minor child that are reasonably certain to occur before the age of eighteen (18);

     c.     Care related to the minor child's disability that is likely to occur before the age of eighteen (18), including the necessity of psychiatric care;

     d.     Provision of extraordinary medical care for the minor child;

     e.     Expenditure of economic resources to provide for the minor child before the age of eighteen (18), including, but not limited to, special education, assistance, or appropriate therapies such as art therapy, equine therapy, or any other type of treatment which may alleviate some of the Minor Child's suffering due to Defendants' actions and/or inactions;

     f.     Substantial injury to their psyche and emotional state;

     g.     Loss of society, companionship, and consortium with the minor child; and,

     h.     Lost wages from having to take time off to manage the minor child, the investigation, and doctors' visits, among other things.

225.    Plaintiffs should be awarded all damages flowing from any necessaries claim or any other damages they may suffer or continue to suffer because of Defendants' (and their employees') multiple actions and/or inactions.

WHEREFORE, Plaintiffs respectfully pray for judgment against all Defendants for all actual damages and consequential damages, all punitive damages in an amount to be determined

by the jury (except as to FCS/FBT), for the costs and disbursements of this action, and for such

other and further relief as this Court deems is just and proper.


*/s/   S. Randall Hood*
S. Randall Hood
S.C. Bar Number: 6103
McGowan, Hood, Felder & Phillips, LLC
1539 Health Care Dr.
Rock Hill, SC 29732
803.327.7800
rhood@mcgowanhood.com


Rock Hill, South Carolina
January 25, 2024